**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SONYA KELEPECZ,            )
    *Plaintiff*,            )
                           )   CASE NO. 3:21-cv-136 (OAW)
    v.            )
                           )
CHILDREN'S LEARNING CENTERS            )
OF FAIRFIELD COUNTY, INC.,            )
    *Defendant*.            )
                           )

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendant's Motion for Summary Judgment. ECF No. 55. Plaintiff Sonya Kelepecz worked for Defendant Children's Learning Centers of Fairfield County, Inc. ("Defendant" or "CLC") as the Director of Development. Plaintiff suffers from trigeminal neuralgia—a condition causing spontaneous, excruciating facial pain—and she periodically took intermittent leave for the debilitating pain. After serving the non-profit for 11 years, Defendant terminated her at age 68 and replaced her with someone less than half her age. She brings claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"); and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA").[1] The court reviewed Defendant's motion, Plaintiff's opposition, ECF No. 61, Defendant's reply in support of the motion, ECF No. 62, and the record in this case.[2] For the reasons discussed herein, the motion is **GRANTED IN PART** and **DENIED IN PART.**

---

[1] Plaintiff has waived her medical leave retaliation claims under the Family Medical Leave Act of 1993. The court therefore does not address these claims in this ruling.

[2] The court finds that the briefs are thorough and complete and that there is no need for oral argument on the motion. Therefore, Plaintiff's request for oral argument is denied. *See* D. Conn. L. Civ. R. 7(a)(3)

I.   **BACKGROUND**

On September 22, 2008 (at age 57), Plaintiff Sonya Kelepecz was hired by Defendant as the Director of Development.  Pl.'s 56(a)(2) Stmt. ¶ 3, ECF No. 61-2. Defendant's then-Chief Executive Officer, Barbara Garvin-Kester, hired her, and she reported directly to the CEO.  *See id.* ¶ 4; Pl.'s Ex. 1, Kelepecz Dep. at 49:16–18, ECF No. 61-3 at 1–30.  As Director of Development, Plaintiff's main role was to raise money through the following initiatives: (1) building donor, community, and board member relationships; (2) identifying funding sources, such as grants, charitable events, and donations; and (3) planning and executing fundraisers.  *See* Pl.'s 56(a)(2) Stmt. ¶ 5.

In or before 2011, Plaintiff was diagnosed with trigeminal neuralgia.  *See* Pl.'s Ex. 1, Kelepecz Dep. at 222:25–223:10.  Plaintiff disclosed her diagnosis to Garvin-Kester (CEO), Marc Teichman (Director of Human Resources), and Darrell Ingram (Chief Financial Officer).  *See id.*  Plaintiff's director-level position meant she had a flexible work schedule insofar as she could work on-site or remotely, and take time off without reporting her hours to the CEO or other CLC staff.  Pl.'s 56(a)(2) Stmt. ¶ 7.  When her condition caused her excruciating facial pain, Plaintiff generally worked from home so that she could avoid talking (for instance, by communicating through e-mail or text messages) but she occasionally took one or two sick days at a time.  *See id.* ¶¶ 8–11; Pl.'s Ex. 1, Kelepecz Dep. at 222:3–24.

In 2014, Defendant hired Marc Jaffe as the new CEO.  *See* Pl.'s Ex. 2, Jaffe Dep. at 17:23–25, ECF No. 61-3 at 31–87.  Jaffe testified that he was hired, at least in part, to

---

("Notwithstanding that a request for oral argument has been made, the Court may, in its discretion, rule on any motion without oral argument.").

improve CLC's fundraising.   *See id.* at 114:24–115:10.   Initially, Plaintiff was the only employee  performing development activity, but because the organization was growing, Jaffe built out his development team.   *See id.*; Pl.'s Ex. 7, Perf. Rev., ECF No. 61-3 at 121–127.   Jaffe testified that multiple people, including board members, leadership council members, and others involved with development, were expected to fundraise. *See* Pl.'s Ex. 2, Jaffe Dep. at 139:3–12.   Jaffe never collected information about how much money specific staff members, including Plaintiff, raised.   *See id.* at 137:14–138:24, 153:2–19.   In consultation with the Board and with approval from the finance committee, Jaffe set "ambitious" annual fundraising goals, which he did not expect CLC to meet.   *Id.* at 143:4–146:14.

Jaffe also testified about Defendant's funding sources.   He stated that the primary funders are the state and federal government.   *Id.* at 18:21–19:3.   As far as donations, Jaffe testified that the donor base has been changing, moving towards hedge fund philanthropists "focused on data."   *Id.* at 116:15–22.   Jaffe explained,

> A lot of the folks on the other side of that table are analysts.  They are much more quantitative than qualitative.  They don't want to hear narrative and story.   So you need somebody who can be very comfortable in that environment.   And as I indicated, some of our largest funders didn't have confidence and want to work with Ms. Kelepecz.

*Id.* at 116:15–22.   Jaffe testified that "certainly some [of the data-focused donors] are younger," but not all, adding: "it doesn't matter to me if what you are focusing on is the data."   *Id.* at 117:12–17. When asked whether donors' technology focus has something to do with the fact they are younger, Jaffe testified, "I have no idea.   I can't tell you I'm happy about it.   But that's a philosophical conversation we can have when we are not in a deposition."   *Id.* at 117:5–8.

Over the course of Plaintiff's employment, Jaffe completed one performance review for her, which he signed in January 2017 ("Performance Review"). *See* Pl.'s Ex. 7, Perf. Rev.; Pl.'s Ex. 2, Jaffe Dep. at 75:16–22. Defendant's review process is based on a one-through-five scale: (1) "fails to meet expectations," (2) "meet some expectations – but not all," (3) "meets all expectations," (4) "meets all – and exceeds some expectations," and (5) "is widely viewed as having demonstrated performance superior to others in the Agency and meets or exceeds all expectations." Pl.'s Ex. 7, Perf. Rev. at 125. An employee who receives an overall One requires "immediate action" and an employee who receives an overall Two "must be informed of the specific reasons for this evaluation" along with a "plan for addressing the shortfall" that is then discussed and documented. *Id.* Jaffe did not give Plaintiff an overall ranking, but for the "performance factors" he awarded her 3 Fives, 1 Four, 11 Threes, 2 Twos, and 0 Ones. *Id.*

At the end of the review, Jaffe summarized Plaintiff's strengths and weaknesses. Jaffe described her strengths as her passion and commitment; work ethic; professionalism; reliability; ability to multi-task and meet deadlines; ability to maintain strong relationships, including with program directors and "certain funders;" and knowledge about "certain kinds of fundraising." *Id.* In describing her areas of improvement, Jaffe acknowledged she "functioned as a one woman band doing both development and marketing" but needed to adjust because the team had grown to six people. *Id.* He focused her needed improvements on two areas: interpersonal dynamics and technology. First, she needed to work on delegation, communication, and managing others. *See id.* Second, she needed to improve her technological skills, including generating reports and spreadsheets, developing skills to work with "hedge fund

philanthropists," and becoming "committed to systems and certain reports," which he described as "the only way we get to our ambitious goals." *Id.*

After the Performance Review, neither Jaffe nor another CLC employee created a plan to improve Plaintiff's identified issues.  For instance, Jaffe did not require Plaintiff to complete trainings or other initiatives that would address the identified areas of improvement.  When asked why he did not require technical skills training, Jaffe said, "It's a good question," adding that, as a C-suite executive, she should have availed herself of the webinars and program invitations she received over e-mail.  *See* Pl.'s Ex. 2, Jaffe Dep. at 107:19–108:7.  Teichman testified that supervisors sometimes bring in Human Resources to counsel an employee who is "struggling with their performance," but Jaffe did not engage Human Resources for Plaintiff's performance.  *See* Pl.'s Ex. 11, Teichman Dep. at 32:2–4, ECF No. 61-3 at 157–194.  Nor did Jaffe complete another performance review after January 2017.  Pl.'s Ex. 2, Jaffe Dep. at 75:16–22.  When asked why, Jaffe stated, "I think, you know, it was a failing.  What can I say?"  *Id.* at 77:2–3.

Jaffe testified that he thought about terminating Plaintiff as early as 2016.  *See id.* at 17:15–21.  However, he did not terminate her until 2019 because "there was a great deal going on" and he "wanted to plan for a responsible transition."  *Id.* at 18:2–8.  Jaffe testified that his "plan was to build up capacity within the organization both on the technology front and with regard to our donor base so that we could effectively replace Ms. Kelepecz."  *Id.* at 53:16–22.  According to Defendant's Board Chair Robert Mattis, Jaffe shared his concerns about Plaintiff's performance "on and off for a number of years," specifically with respect to donors and one gala event.  *See* Def.'s Ex. 7, Mattis Dep. at

29:12–25, ECF No. 57-1 at 115–126.   Jaffe never shared performance concerns with Teichman.  *See* Pl.'s Ex. 11, Teichman Dep. at 9:23–10:9, 33:18–34:4.

At the end of 2018, CLC created a Data Committee.  *See* Pl.'s Ex. 2, Jaffe Dep. at 159:9–12.  The purpose of the Data Committee was to strengthen Defendant's ability to collect and analyze data, so the organization could then present data to funders.  *Id.* at 163:1–7.  The Data Committee included Jaffe, some board members, and the following CLC staff: Mary Trent, Yuna Johnson, and Penny Lehman, all who shared duties in data, data analytics, and metrics.[3] *See id.* at 160:4–162:19; Def.'s Ex. 3, Jaffe Dep. at 81:24–82:5, ECF No. 57-1 at 56–91; Pl.'s Ex. 8, Hallissey Dep. at 91:3–8.  Jaffe wanted his "funders who were more sophisticated, more demanding around data" to work with Trent and believed that the Data Committee would be a "waste of [Plaintiff's] time" as "[s]he wouldn't have understood much of what was going on and … there was a lot of other things that she needed to be doing."  *See* Pl.'s Ex. 2, Jaffe Dep. at 176:15–19.  Plaintiff believes that Trent, Johnson and Lehman are 20 to 30 years younger than her, *see* Pl.'s Ex. 10, Kelepecz Aff. ¶ 5, ECF No. 61-3 at 156, and Defendant did not submit evidence to the contrary.

Jaffe began pursuing Plaintiff's replacement in early 2019.  *See* Def.'s Ex. 3, Jaffe Dep. at 51:4–12.  Defendant did not post the Director of Development position, and Teichman testified that he did not know how Jaffe got his applicants.  *See* Pl.'s Ex. 11, Teichman Dep. at 11:17–12:5.  Jaffe interviewed approximately five people between February and June 2019, starting with Cynthia Gorey to whom Defendant offered a

---

[3] Director of Strategic Partnerships Jennifer Hallissey sat in on some meetings and supports the Data Committee.  *See* Pl.'s Ex. 8, Hallissey Dep. at 30:16–19, 91:4–18, ECF No. 61-3 at 129–194; Summ. J. Mem. at 8 (listing Hallissey's title).

position in May but who declined.  *See* Def.'s Ex. 3, Jaffe Dep. at 54:1–22; Pl.'s 56(a)(2) Stmt. ¶ 52.  Jaffe ultimately identified and hired Corey Paris, who was less than 30 years old when he received the job offer in September 2019.[4]  *See* Pl.'s Ex. 2, Jaffe Dep. at 39:17–40:23, 69:5–7.

From August 26 until September 18, 2019, Plaintiff was not able to work in the office due to debilitating pain caused by trigeminal neuralgia.  *See* Def.'s Ex. 1, Kelepecz Dep. at 222:2–7, 260:8–15, 271:13–23, ECF No. 57-1 at 1–51.  Plaintiff texted Jaffe that she could not come into work on August 26 "because of the pain," but she did not indicate how long she expected to be out of the office because she did not know how long the pain would last.  *See id.* at 272:5–273:12.  During these three weeks, Plaintiff worked when she could and kept in "constant touch" with Jaffe.  *Id.* at 262:3–264:25.

On October 3, 2019, Defendant terminated Plaintiff.  Jaffe was the sole decision-maker.  *See* Pl.'s Ex. 2, Jaffe Dep. at 42:9–43:2; Pl.'s Ex. 4, Mattis Dep. at 22:12–23:23, ECF No. 61-3 at 105–110.  Aside from Plaintiff, Teichman and Mattis were present for the termination meeting.  *See id.*; Def.'s Ex. 7, Mattis Dep. at 50:1–25; Pl.'s Ex. 11, Teichman Dep. at 21:8–21.  The termination meeting lasted less than 15 minutes.  *See* Pl.'s Ex. 4, Mattis Dep. at 22:16–17.  When Plaintiff asked for the termination reason, Jaffe responded with, "New skills," but did not explain further.  Def.'s Ex. 1, Kelepecz Dep. at 242:10–243:7.  Jaffe testified that he "fired the plaintiff for a panoply of reasons," naming "some of the highlights" as "inability to work with technology, her discomfort with data, with her inability to bring in new donors, with a lack of strategic thinking, with not being particularly collaborative or communicative with colleagues, not being a team player."  *Id.*

---

[4] Jaffe could not recall the exact date but said, "I think [Plaintiff] was back at work." *Id.* at 39:7–40:19.

at 63:25–64:9.  According to Mattis, Jaffe described her performance issues as "centered on fund raising, ability to meet fund raising goals, raise funds, attract new funders."  Def.'s Ex. 7, Mattis Dep. at 17:11–16, 20:8–21.

Since Plaintiff's termination, several of her past colleagues (other than Jaffe) have testified about their experiences working with her.  The first is Jennifer Hallissey, who was on the development team and worked closely with Plaintiff on grant-writing.  Hallissey testified that Plaintiff "created a very toxic environment" for her, including when she twice slapped Hallissey on her buttocks.  Def.'s Ex. 5, Hallissey Dep. at 21:2–8, 73:6–19, ECF No. 57-1 at 98–107.  Prior to joining Defendant, Hallissey worked for United Way and informed Jaffe that one of Plaintiff's grants were "atrocious"; once she joined, her job "was shaped by" what Jaffe "did not trust" Plaintiff to do.  *See id.* at 18:14–22:22.

The second is Yuna Johnson, who was hired shortly before Plaintiff's termination as Defendant's Data Analytics Manager and whose main job duty is to "manage CLCs database and create reports."  *See* Pl.'s Ex. 5, Johnson Dep. at 7:13–20, ECF No. 111–118.  Johnson stated that she had no issues with Plaintiff's performance and felt Plaintiff did a good job, adding she was surprised to hear Plaintiff was terminated.  *See id.* at 24:18–25:19.  With respect to technical competencies, Johnson explained that Plaintiff knew more about Raiser's Edge than she did but less than Defendant's IT consultant, and Plaintiff could read and input data into Microsoft Excel but had "limited competency" on it.  Def.'s Reply Ex. 2, Johnson Dep. at 31:8–32:19, ECF No. 62 at 21–24.

The third is CFO Ingram, who worked with Plaintiff throughout her entire tenure.  Pl.'s Ex. 3, Ingram Dep. at 8:16–18, ECF No. 61-3 at 88–105.  In contrast to Hallissey, Ingram believed she "worked very hard" and was a "very dedicated employee," *id.* at

11:10–12, adding that in his 40-year experience working in non-profits with 12 different development directors, he believed Plaintiff "was very good [at] what she did," *id.* at 48:7–17.  When asked if Plaintiff did not work well with younger employees, Ingram answered: "That would be a complete shock to me because she got along very well with the two people in my department and they are both much younger than me."  *Id.* at 39:14–22.

Lastly, Elissa Ingram, who worked as the Development Assistant on an independent contractor basis from July 2008 to January 2020, submitted an affidavit attesting to Plaintiff's workplace abilities and their 11-year working relationship.  *See* Pl.'s Ex. 6, Ingram Aff. ¶¶ 3 & 9, ECF No. 61-3 at 119.  Ingram performed various Raiser's Edge database tasks, including data entry, producing donor letters and materials, and generating reports for executives.  *See id.* ¶ 4.  She testified that Plaintiff interfaced with her on these projects but did not perform these tasks; this division of labor remained consistent after Paris replaced Plaintiff.  *See id.* ¶¶ 5–7.  Ingram believed Plaintiff was a successful, excellent Director of Development who worked well with others, noting that she "was a very likeable colleague, a good person and well-liked by CLC's employees, clientele and had good working relationships with event vendors."  *See id.* ¶ 10–12.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden

has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Instead, the party opposing summary judgment must set forth in its response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At summary judgment, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact best left for determination by a jury at trial. *Anderson*, 477 U.S. at 249.

III.     **DISCUSSION**

Defendant moves for summary judgment on Plaintiff's age and disability discrimination claims under the ADEA, the ADA, and the CFEPA.  The ADEA makes it unlawful for an employer to "discharge any individual … because of such individual's age." 29 U.S.C. § 623.  The ADA prohibits a "covered entity" from "discriminat[ing] against a qualified individual on the basis of disability," including through the "discharge of employees."  42 U.S.C. § 12112(a).  The CFEPA states that an employer commits a "discriminatory practice" when it discharges an employee "because of" their age or physical disability.  Conn. Gen. Stat. § 46a-60(b)(1).

The federal and state statutes require different levels of causation between the adverse action and the discriminatory animus.  Under the ADEA and ADA, a plaintiff must show that their status in the protected class is the "but-for cause" of the termination.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (ADEA); *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) (ADA). In contrast, the CFEPA is subject to a lower standard, and merely requires the protected class to be a "motivating factor" for the discrimination.  *Wallace v. Caring Solutions, LLC*, 213 Conn. App. 605, 626 (2022).

The ADEA, the ADA, and the CFEPA all operate under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (ADEA and ADA); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (CFEPA, citing *Craine v. Trinity Coll.*, 259 Conn. 625, 637 (2002)).  First, a plaintiff faces the initial, low threshold of stating a prima facie case under the relevant statute.  *See McDonnell Douglas*, 411 U.S. at 802.  It is well-established that this burden is de minimis.  *See Green*

*v. Town of East Haven*, 952 F.3d 394, 404 (2d Cir. 2020).  Once a plaintiff has made their prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.  *See McDonnell Douglas*, 411 U.S. at 802–03.  If the defendant is able to do so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual and that the defendant's actions were based upon discriminatory animus.  *See id.* at 804.

Defendant challenges Plaintiff's age and disability discrimination claims at each of the three steps of the *McDonnell Douglas* framework.  Because the prima facie elements are slightly different for the two protected classes, the court will address the age and disability discrimination claims separately.

### A.     Age Discrimination (Counts One and Four)

Defendant challenges Plaintiff's age discrimination claims at each step of the *McDonnell Douglas* framework.  For the initial prima facie stage, Defendant argues that Plaintiff cannot establish she was qualified for her position or that her employer acted with the intent to discriminate against her on the basis of her age.  Next, Defendant contends it had a legitimate, non-discriminatory reason to terminate her: poor performance.  Lastly, Defendant posits that Plaintiff cannot show the termination reason was pretextual.  Plaintiff disagrees with each of the three arguments.

### 1.     Prima Facie Case

To establish a prima facie case of age discrimination under both the ADEA and the CFEPA, a plaintiff must demonstrate that: 1) they are "within the protected age group"; 2) they were "qualified for the position"; 3) they were "subject to an adverse employment action"; and 4) "the adverse action occurred under 'circumstances giving rise to an

inference of discrimination.'"  *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003) (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)); *Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 260 (D. Conn. 2013) (using same framework in CFEPA context).  The parties dispute the second and fourth elements.

### i.      *Second Element: Qualification*

The court begins with the second element.  To show that they are qualified for the position, a plaintiff need only show "that they possess[ ] the basic skills necessary for performance of the job."  *Kovaco*, 834 F.3d at 136 (in ADA/ADEA case, quoting *Robinson v. Concentra Health Servs.*, 781 F.3d 42 (2d Cir. 2015)).  The standard is "minimal"—"all that is required is that the plaintiff establish basic eligibility for the position at issue…." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91–92 (2d Cir. 2001).  Put another way, the plaintiff's performance can be below-average so long as there is some evidence that the "performance was of sufficient quality to merit continued employment."  *See Saliga v. Chemtura Corp.*, No. 12-cv-832 (VAB), 2015 WL 5822589, at *5 (D. Conn. Oct. 1, 2015) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).

Defendant argues that Plaintiff cannot establish she was qualified because she cannot produce evidence of "satisfactory performance."  *See* Summ. J. Mem. at 13–14, ECF No. 56.  Specifically, Defendant contends Plaintiff was not qualified because she lacked technical skills, failed to work cooperatively with her colleagues, received donor and board member complaints, had errors in her work product, and was criticized in her Performance Review.  *See* Summ. J. Mem. at 15.[5]  Defendant relies on *Thornley v.*

---

[5] Defendant does not cite the record for this argument.

*Penton Pub., Inc.*, 104 F.3d 26, 30 (2d Cir. 1997), which stands for the proposition that the qualification element is based on a plaintiff's ability to meet the employer's legitimate, or "honestly-held expectations."   The *Thornley* Court explained that the "qualified" element "refers to the criteria the employer has specified for the position," which is why the United States Court of Appeals for the Second Circuit has "occasionally analyzed this element in terms of whether the plaintiff shows 'satisfactory job performance' at the time of discharge."  *Id.* at 29.

After *Thornley*, the Second Circuit clarified in *Slattery v. Swiss Reinsurance America Corporation*, what "satisfactory performance" means in the context of the qualification element.  While the Second Circuit acknowledged "satisfactory performance" can be used to show a plaintiff is qualified, it clarified that a defendant *cannot* use performance to raise the bar beyond "basic eligibility for the position."  *Slattery*, 248 F.3d at 91–92.  Going beyond the "basic skills necessary" would "shift onto the plaintiff an obligation to anticipate and disprove, in [her] *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."  *Id.* at 92 (emphasis in original). The Second Circuit explained that "a mere variation in terminology between 'qualified for the position' and 'performing … satisfactorily' would not be significant so long as, in substance, all that is required is that the plaintiff establish *basic eligibility* for the position at issue, and not the greater showing that he satisfies the employer."  *Id.* at 91–92 (emphasis added).   In other words, the court may not require a plaintiff to prove the satisfactory nature of her performance goes beyond "basic eligibility," as doing so would effectively eliminate the defendant's burden to provide a legitimate, non-discriminatory reason (of poor performance).

Here, when drawing all factual inferences in Plaintiff's favor, the court finds that she possessed at least the basic skills necessary to perform her duties as Director of Development.  Plaintiff's job duties—building relationships, identifying funding sources, and planning fundraisers—are high-level tasks, and her job description does not expressly require specific technological skills.  *See* Pl.'s 56(a)(2) Stmt. ¶ 5; Def.'s Ex. 2, Job Description, ECF No. 57-1 at 52–55.  The record indicates that Plaintiff held the Director of Development position for 11 years, *see* 56(a)(2) Stmt. ¶ 3; that colleagues believed she was a dedicated and good performer, *see* Pl.'s Ex. 3, Ingram Dep. at 11:10–12, 48:10–11; Pl.'s Ex. 5, Johnson Dep. at 25:14–19; the CFO disagreed with the decision to terminate her, *see* Pl.'s Ex. 3, Ingram Dep. at 10:20–11:6; that CLC's annual donations averaged around $1.8 to 1.9 million from 2018 to 2021 (i.e., during and after Plaintiff's employment); and that Plaintiff worked well with others, *see id.* at 39:19–22; Pl.'s Ex. 5, Johnson Dep. at 25:14–19; *see* Pl.'s Ex. 6, Ingram Aff. ¶¶ 10–12.  With this record, the court finds Plaintiff easily establishes she is qualified.

Furthermore, the Performance Review indicates that Plaintiff has the "basic skills necessary" to complete her job.  Out of the one-through-five scale, Plaintiff never received a score of "one" on any of the 18 categories.  *See* Pl.'s Ex. 7, Perf. Review.  In fact, she received "meets all expectations" or above on all categories except two.  *See id.*  With these scores, a reasonable jury could conclude she had the basic skills necessary for the job.  *See Saliga*, 2015 WL 5822589, at *5.  Therefore, despite some of Jaffe's criticisms, the Performance Review indicates Plaintiff was qualified.

The court has reviewed Defendant's case law about the second prima facie element, and finds the cases unavailing.  Many of Defendant's cases predate *Slattery*,

which means the courts evaluated "job performance" without the benefit of the Second Circuit's "basic eligibility" explanation.

Of the cases that *post*-date *Slattery*, most either did not address the particular facts of that case or, if they did, they support a finding that Plaintiff was qualified for her position, given her skillset and lengthy tenure in the role. *See, e.g., Onorato v. TriMedx LLC*, No. 3:13CV1494 (HBF), 2014 WL 4365076, at *2 (D. Conn. Sept. 2, 2014) ("[B]ecause Onorato was employed by TriMedx for approximately three years, this Court can plausibly infer that by TriMedx's own standards he was qualified for his position."); *Abbate v. Cendant Mobility Servs. Corp.*, No. 3-03-cv-1858(DJS), 2007 WL 2021868 at *7, 10 n.9 (D. Conn. July 13, 2007) (finding plaintiff established she was qualified to work under both the ADEA and the ADA); *c.f. Gonzalez v. Carestream Health Inc.*, 520 F. App'x 8, 10 (2d Cir. 2013) (finding plaintiff established ADEA claim at motion to dismiss stage); *Choate v. Transport Logistics Corp.*, 234 F. Supp. 2d 125, 129 (D. Conn. 2002) ("assum[ing], arguendo, that plaintiff has satisfied his de minimums burden to establish a prima facie case"); *Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d 365, 371 (D. Conn. 2009) (assessing plaintiff's qualifications under ADA standard).

For the few post-*Slattery* cases that addressed the facts *and* held the plaintiff was unqualified, the cases are distinguishable insofar as those plaintiffs were short-term employees, had documented and long-standing issues of inappropriate conduct, and/or missed deadlines—issues that Plaintiff does not have. *See Saliga*, 2015 WL 5822589, at *5–6 (finding plaintiff was not qualified when she was employed for less than a year before being placed on a performance improvement plan); *Lavorgna v. Hamden Shoreline Oral and Maxillofacial Surgery Assocs., P.C.*, No. 3:19-cv-7 (VLB), 2020 WL

4352611, at *6 (D. Conn. July 29, 2020) (finding plaintiff did not establish she was qualified for the position because she had a long-standing history of inappropriate conduct with coworkers, which fell below the employer's "legitimate expectations"); *Henderson v. Ebm-Papst, Inc.*, No. 3:09-cv-2135 (WWE), 2011 WL 3859671, at *3 (D. Conn. Aug. 31, 2011) (finding plaintiff's performance "became unsatisfactory" when he failed to finish a report and lacked confidence about it and observing "it is doubtful plaintiff satisfies the second element" without acknowledging *Slattery*'s "basic eligibility" standard). In summary, the court will not adopt Defendant's "satisfactory performance" argument, as it appears to create a heightened burden rejected by the Second Circuit.

### ii.   *Fourth Element: Intent*

Moving on to the prima facie case's fourth element, the court finds there is sufficient evidence of age-based discriminatory animus. It is well-settled that evidence of "a significant age discrepancy can support a *prima facie* inference of discriminatory intent" so long as "some evidence indicates defendant's knowledge as to that discrepancy." *See Woodman v. WWOR-TV Inc.*, 411 F.3d 69, 81 (2d Cir. 2005). As the Second Circuit explained in *Woodman*, "in the majority of age discrimination cases, a defendant employer's knowledge of a plaintiff's age will be undisputed because employers routinely maintain employee age information in their personnel files or are generally aware of employees' relative ages from personal on-the-job contact." *Id.* at 80.

Here, it is undisputed that Plaintiff, age 68, was replaced by someone 39 years (or more) her junior. *See* Pl.'s Ex. 2, Jaffe Dep. at 69:5–7. It is also undisputed that Jaffe personally identified, interviewed, and chose the replacement. *See id.* at 39:17–40:5; Pl.'s Ex. 11, Teichman Dep. at 21:25–26:11; 56(a)(2) Stmt. ¶ 53. Defendant does not

contend that Jaffe was *unaware* of Paris' age when he interviewed and hired him. Accordingly, there is sufficient evidence that Defendant hired a significantly younger replacement and was aware of the age discrepancy.[6]

## 2.      Legitimate, Non-Discriminatory Reason

Because Plaintiff has established a prima facie case of age discrimination, the burden shifts to Defendant to establish a legitimate non-discriminatory reason for termination: here, poor performance. *See* Summ. J. Mot. at 25–26. Poor performance is a well-established legitimate, non-discriminatory reason for termination. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000). At the second *McDonnell Douglas* step, Defendant's burden is one of production, which means it must provide admissible evidence that its reason is legitimate and nondiscriminatory. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 132 (2d Cir. 2012).

Here, Defendant's evidence of poor performance can be broken down into two main categories. First, testimony from Jaffe, Hallissey, and Mattis as well as the Performance Review show that Defendant's agents believed Plaintiff lacked sufficient technological skills for her job, specifically with Raiser's Edge, pulling reports, and working with tech-focused donors. *See* Summ. J. Mem. at 6–7. Second, the same evidence supports Defendant's contention that Plaintiff had issues communicating with donors and team members. *See id.* at 7–9. After reviewing this evidence, the court finds Defendant satisfies its burden of production.

---

[6] Again, Defendant's cited cases are unpersuasive on this topic because they either predate *Woodman*, address discriminatory intent at the pretext stage, or both. The court also notes that the parties brief several other issues regarding discriminatory intent. Because *Woodman* makes clear that, at the prima facie stage, discriminatory intent may be established through evidence of the significant age gap and defendant's knowledge thereof, the court finds that the other arguments are more appropriately addressed at the pretext stage.

### 3. Pretext

With the second stage satisfied, the burden shifts back to Plaintiff to establish Defendant's reason for termination is pretextual. "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) and citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)); *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177–78 (D. Conn. 2015) (explaining a plaintiff may show pretext "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons") (internal quotation marks omitted).

After reviewing the record, the court finds pretext evidence includes, but is not necessarily limited to, the following: The only document that shows any performance criticism is the Performance Review, which was completed by Plaintiff's supervisor nearly three years before her termination. *See* Pl.'s Ex. 7, Perf. Rev. While the Performance Review indicates that Plaintiff should improve her teamwork and technology skills, a reasonable jury could conclude that the criticisms are internally inconsistent, that the review is otherwise positive, and that it did not lead to a performance improvement discussion or documentation. *See id.*; Pl.'s Ex. 2, Jaffe Dep. at 76:5–13, 104:21–107:5. After the review, neither Jaffe nor Human Resources ever gave Plaintiff tools or resources to improve, even though "a plan for addressing the shortfall" was required for employees

who received low rankings.   Pl.'s Ex. 2, Jaffe Dep. at 107:19–108:7; Pl.'s Ex. 11, Teichman Dep. at 32:2–4.   Moreover, Jaffe never reviewed her performance again and had no reason for failing to do so.   *See* Pl.'s Ex. 2, Jaffe Dep. at 75:16–77:3.

Instead, Jaffe created a "plan … to build up capacity within the organization both on the technology front and with regard to our donor base so that we could effectively replace Ms. Kelepecz."   *Id.* at 53:16–22.   He hired people to manage data analytics, yet criticized Plaintiff for delegating reports to those with whom she worked.   *See id.* at 30:2–31:4, 77:10–79:23, 152:10–13, 162:9–19, 180:4–8; Pl.'s Ex. 8, Hallissey Dep. at 89:6–90:22; Def.'s Reply Ex. 4, Paris Dep. at 44:21–89:10.   At the end of 2018, Jaffe created a Data Committee and put significantly younger employees on it, rather than Plaintiff.[7] *See* Pl.'s Ex. 2, Jaffe Dep. at 159:9–163:7; Def.'s Ex. 3, Jaffe Dep. at 81:24–82:5; Pl.'s Ex. 8, Hallissey Dep. at 91:3–8; Pl.'s Ex. 10, Kelepecz Aff. ¶ 5.   After building up his development team, Jaffe replaced Plaintiff with someone under the age of 30 who—while "conversant with technology," Pl.'s Ex. 11, Teichman Dep. at 27:17–20—lacked Plaintiff's skills, *see* Pl.'s Ex. 3, Ingram Dep. at 38:8–39:13.   While it is true that a reasonable jury could conclude Jaffe hired additional development staff to perform duties Plaintiff failed to do (as Defendant argues), a reasonable jury also could conclude that Jaffe strategically hired younger people to take over her job duties so that he could fire her due to her age.

---

[7] Defendant argues that the Data Committee was a "Board-level Committee, consisting primarily of CLC Board Members, that focused on student assessments, analytics, and data," adding that it "is not involved in funders, funding sources or development."   Def.'s Reply at 6.   Only part of this statement is supported by evidence, as Defendant cites Jaffe's testimony: "[T]he work of the data committee is no, it's not directly – it doesn't deal with funders.   The development team benefits from some of its output, but the data committee is not looking at funding sources, for instance."   *See id.* (citing Def.'s Reply Ex. 3, Jaffe Dep. at 101:21–25).   In another part of his deposition, Jaffe testified that "the purpose of this committee was to strengthen our – our ability or to collect data and to – and to analyze it and to present it in – in a way that funders could – funders could understand."   Pl.'s Ex. 2, Jaffe Dep. at 163:1–7.   The import of the Data Committee will be for the jury to decide.

Putting this into context, a reasonable jury could conclude that Jaffe systematically ignored Plaintiff's experience and skillset in the development field, built out a data and development team to sideline her in favor of younger individuals, fired her, and then replaced her with a significantly younger replacement.

The court finds the above evidence satisfies Plaintiff's burden for several reasons. First, Plaintiff's prima facie case—i.e., the fact she was replaced by a significantly younger employee—is a "reliable indicator" of discriminatory intent. *Woodman*, 411 F.3d at 78. Second, evidence shows Defendant did not address Plaintiff's purportedly "poor performance" according to its regular practices. *See* Pl.'s Ex. 7, Perf. Rev. at 124 (requiring a "plan for addressing the shortfall" or "immediate action" for two lowest rankings); *see* Pl.'s Ex. 11, Teichman Dep. at 32:13–22 (describing corrective action and counseling processes for poor performers). "[E]vidence of inconsistency in defendant's handling of supposedly underperforming employees" is evidence of pretext. *Carlton*, 202 F.3d at 137. Third, even though Defendant contends Jaffe had been unhappy with Plaintiff's performance since 2016, a reasonable jury could find that the Performance Review is not unsatisfactory, but neutral (or positive, with constructive criticism) and that his decision to retain her for several years cuts against claims of poor performance. *See generally id.* Fourth, Jaffe's "plan" to prepare for Plaintiff's replacement appears to have included hiring people who are younger than Plaintiff and placing them on a committee from which he excluded her. *See Chambers*, 43 F.3d at 37 (explaining that "favorable treatment of employees not in the protected group" and "the sequence of events leading to the plaintiff's discharge" are "[c]ircumstances contributing to a permissible inference of

discriminatory intent").  Accordingly, a reasonable jury could conclude Defendant's reason for terminating Plaintiff was pretext for age discrimination.

From the court's assessment of the record, the evidence favorable to Defendant's position is based almost exclusively on Jaffe's state of mind.  It is well-established that "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate."  *Carlton*, 202 F.3d at 134; *DeAngelo*, 105 F. Supp. 3d at 179.  Here, Defendant's evidence of Plaintiff's purported poor performance largely comes from Jaffe's testimony, the Performance Review (a document he created with no input from anyone else), and information that Jaffe told other witnesses.  *See generally* Def.'s 56(a)(1) Stmt. ¶¶ 16–50; Def.'s Ex. 6, Perf. Rev., ECF No. 57-1 at 108–114; Def.'s Ex. 7, Mattis Dep. at 20:7–21, 29:9–32:14; Pl.'s Ex. 11, Teichman Dep. at 9:5–11:11.  This is crucial because Jaffe was not only the sole decision-maker but he also operated in a silo—he, alone, evaluated Plaintiff's performance, and decided when she would receive her next review (he concluded she never would), whether she should receive opportunities to improve, whether he should look for a replacement, and who should be that replacement.  *See* Pl.'s Ex. 11, Teichman Dep. at 8:7–24, 10:3–9, 32:1–34:7 (testifying that HR had no role in Plaintiff's Performance Review, formal counseling, and/or termination and hiring decisions).  In other words, Jaffe had unfettered opportunity to paper Plaintiff's file—or, in this case, to barely put anything in the file at all—without checks and balances to minimize the opportunity for discrimination.

Where Defendant's evidence is *not* based on Jaffe, it is disputed.  For example, Hallissey testified that Plaintiff created a "toxic environment," Def.'s Ex. 5, Hallissey Dep. at 21:2–8, but Johnson, CFO Ingram, and Data Assistant Ingram all stated that they

enjoyed working with Plaintiff and that they believed she was good at her job, Pl.'s Ex. 5, Johnson Dep. at 24:18:25:19; Pl.'s Ex. 3, Ingram Dep. at 39:14–22, 48:7–17; Pl.'s Ex. 6, Ingram Aff. ¶¶ 10–12.  As another example, there is conflicting evidence about the sufficiency of Plaintiff's technological skills and whether she appropriately delegated tasks.  *See* Def.'s Ex. 2, Job Description (job duties requiring the Director of Development to  "manage the execution of all key development competencies such as database development and management" but does not require the running of reports); Pl.'s Ex. 7, Perf. Rev. ("Needs to delegate and manage more" / "Needs to better trust and rely on others"); Pl.'s Ex. 2, Jaffe Dep. at 77:10–21 (testifying that Plaintiff "couldn't generate" reports and that instead she would delegate that task to Ingram, Trent, or Johnson).  A reasonable jury could find that Jaffe placed Plaintiff in an impossible position by criticizing her for failing to delegate, while also criticizing her for certain acts of delegation (such as her request that team members run reports).  *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (standing for the general position that an employer places an employee in "an intolerable and impermissible catch 22" when it requires her to act a certain way and then criticizes her for doing so), superseded by statute on other grounds as stated in *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. ----, 140 S. Ct. 1009, 1017 (2020).  A jury also reasonably could find this to constitute an impermissible, age-based catch 22, given that both Plaintiff and her significantly younger replacement directed staff members to run reports for them, but only Plaintiff was criticized for having done so.  Pl.'s Ex. 9, Paris Dep. at 99:21–102:7, ECF No. 61-3 at 143–154 (Ingram and Johnson pulled reports for Paris).

The court now turns to Defendant's remaining arguments.  First, Defendant argues this case lacks age-based comments—while this is true, such comments are but one factor among many that can establish discriminatory intent.  *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).

Second, Defendant argues that the inference of discrimination is "much weaker" because Plaintiff was in the protected class when hired.  Summ. J. Mem. at 16.  Generally, discriminatory intent is undermined when a plaintiff is over 40 upon hiring, but courts are clear that this factor is not dispositive.  *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 26 (E.D.N.Y. 2015) (collecting cases).  This is especially true here, because the person who hired Plaintiff is different from the one who terminated her.[8]

Third, Defendant contends that "the key decision-makers in Plaintiff's termination"—whom it identifies as Jaffe, Mattis and Teichman—were the same age or older than Plaintiff.  Summ. J. Mem. at 18.  As an initial matter, the court notes that the record contains testimony from each of these individuals (including Jaffe) identifying Jaffe as the decision-maker.  *See* Pl.'s Ex. 2, Jaffe Dep. at 42:9–43:2; Pl.'s Ex. 4, Mattis Dep. at 23:8–19; Pl.'s Ex. 11, Teichman Dep. at 26:11–20.  In any event, jurisprudence is clear that Jaffe's age does not absolve him from liability.  *See Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (explaining an "inference against discrimination exists" when the decision-maker is in the same protected class, but noting "this does not end the inquiry"); *c.f. Mosby v. Bd. of Educ. of City of Norwalk*, 3:15-cv-01876 (JAM),

---

[8] Defendant argues the "same actor inference" rule applies here.  "When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Carlton*, 202 F.3d at 137–38.  This doctrine is inapplicable because Jaffe did not hire Plaintiff, and it is even "less compelling when a significant period of time elapses between the hiring and firing" (such as 11 years for Plaintiff).  *See id.* at 138.

2017 WL 4368610, at *5 (D. Conn. Sept. 30, 2017) ("Title VII protects against intragroup discrimination—against black-on-black discrimination, woman-on-woman discrimination, Christian-on-Christian discrimination all the same.").

Fourth, the court disagrees with Defendant's contention that "Plaintiff's age discrimination rests on subjective feelings, not admissible evidence." *Id.* at 19. Plaintiff could not control the limited sample of performance reviews, but she has produced deposition testimony and an affidavit from her former coworkers.

Fifth, Defendant states that it offered Plaintiff's position to Cynthia Gorey, who is in her 50s. However, Defendant failed to submit evidence establishing her age. *See* Def.'s Reply at 6.

In summary, the court finds a reasonable jury could conclude Plaintiff's age was a "but for" cause and/or a motivating factor for Defendant's decision to terminate her. The "but for" test "directs us to change one thing at a time and see if the outcome changes." *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020). While the ADEA's "but for" standard is higher than the CFEPA's "motivating factor" standard, the Supreme Court of the United States in *Bostock* made clear that it is still a "sweeping standard," explaining that "[o]ften, events have multiple but-for causes." *Id.* Applying this reasoning to the instant matter, Jaffe could have terminated Plaintiff *both* because he disliked her approach to donors *and* because he believed she was too old. *See id.* ("[I]f a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision.") When drawing all factual inferences in Plaintiff's favor, the evidence supports a finding of discriminatory intent. Accordingly, the court finds that a reasonable jury could conclude

that the plaintiff would not have been terminated had she been 39 years old, or younger.

Therefore, summary judgment is **DENIED** as to Counts One and Four.

### B.    Disability Discrimination

Plaintiff brings two types of disability claims—disability discrimination and "regarded as disability" discrimination—under both the ADA and the CFEPA.  The parties do not distinguish these two types of claims at any point in their briefing.  For all four of Plaintiff's disability claims, Defendant's arguments are the same as its age-based arguments.  Namely, that Plaintiff fails to establish the qualification and intent elements of a prima facie case, that Defendant terminated Plaintiff because she performed poorly, and that Plaintiff cannot establish pretext.  Unlike with Plaintiff's age claims, the court concludes that Plaintiff fails to establish a prima facie case.

To establish a prima facie case of disability discrimination based on disparate treatment, a plaintiff must show (1) their "employer is subject to the ADA"; (2) they are "disabled within the meaning of the ADA"; (3) they are "qualified to perform the essential functions of [her] job, with or without reasonable accommodation"; and (4) they were terminated "because of" her disability.  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quotation marks omitted).

With respect to the third element, the court finds Plaintiff is qualified under the ADA. The definitions of "qualified" under the ADEA and the ADA are slightly different, but Defendant draws no distinction between the two and rests on the same arguments.  *See* Summ. J. Mem. at 20.  In other words, the parties do not dispute whether Plaintiff could perform the essential functions of her job.  Upon review of the record, the court concludes the reasoning for the age discrimination claims applies with equal force to the disability

discrimination claims.  As such, Plaintiff is qualified for her position for the same reasons previously explained.

Turning to the fourth element, the court concludes Plaintiff fails to show evidence of discriminatory intent.  According to Plaintiff: Defendant learned about her trigeminal neuralgia shortly before Jaffe first developed an intent to discharge her; Plaintiff required more time off as her condition worsened; and Jaffe waited three years to terminate her, purely out of convenience.  *See* Opp'n at 21–22.  Plaintiff did not cite any case law to support her position.

The undisputed facts and Plaintiff's own testimony show that: Jaffe was aware of her trigeminal neuralgia diagnosis since at least 2011; as a C-suite executive, she had the luxury of working away from the office as necessary; she worked remotely or took time off when she experienced excruciating pain; she always kept in touch with Jaffe when out of the office; and she rarely took more than one or two days off at a time except in August and September of 2019 (when Jaffe already was in the process of identifying, interviewing, and hiring Paris).  *See* Pl.'s 56(a)(2) Stmt. ¶¶ 7–11; Pl.'s Ex. 1, Kelepecz Dep. at 222:3–24.  No record evidence establishes that Jaffe or anyone else had a problem with and/or made any comments about her disability or time out of the office.  Simply put, the evidence establishes that Plaintiff's diagnosis was a non-issue.  Absent evidence of discriminatory intent and any legal authority of the same, the court must conclude Plaintiff fails to establish the fourth element for her four disability discrimination claims.  Thus, summary judgment is **GRANTED** as to Counts Two, Three, Five and Six.

IV.      <u>**CONCLUSION**</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Summary Judgment is **DENIED** as to Counts One and Four.

2. Summary Judgment is **GRANTED** as to Counts Two, Three, Five, and Six.

3. Count Seven is **DISMISSED** as waived by Plaintiff.

4. Counts One and Four are ready to proceed to trial.  Within 24 days of this ruling, the parties shall e-file a joint status report indicating:

   a. The estimated length of trial;

   b. Whether the parties consent to referral to a United States Magistrate Judge for a settlement conference; and

   c. Whether the parties consent to referral to a (different) Magistrate Judge for a bench **or jury trial** in this matter (pursuant to Local Rule 73), which might well result in trial being scheduled sooner than with the undersigned.

Thereafter, the court will issue such referral(s), or will schedule the matter for trial and will issue corresponding instructions and deadlines.

**IT IS SO ORDERED** in Hartford, Connecticut, this 15th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE